# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A BLACK APPLE IPHONE, CURRENTLY LOCATED AT PHILADELPHIA DISTRICT ATTORNEY'S OFFICE, GUN VIOLENCE TASK FORCE, 112 NORTH BROAD STREET, PHILADELPHIA, PA 19102, FURTHER DESCRIBED IN ATTACHMENT A | )<br>)<br>)<br>)<br>)<br>)　　Case No. 26-mj-1330 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ Eastern _____ District of _____ Pennsylvania _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841; 18 U.S.C. § 922(g)(1); 18 U.S.C. § 933 | Distribution of controlled substances; possession of a firearm by a felon; and firearms trafficking |

The application is based on these facts:

See affidavit of probable cause incorporated by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Franklin Fernandez
*Applicant's signature*

Franklin Fernandez, Special Agent, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 41(d)(3) by _____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 07/09/2026 _____

Digitally signed by Caroline Goldner Cinquanto
Date: 2026.07.09 17:06:53 -04'00'
*Judge's signature*

City and state:　Philadelphia, PA

Honorable Caroline Goldner Cinquanto
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* A BLACK APPLE IPHONE, CURRENTLY LOCATED AT PHILADELPHIA DISTRICT ATTORNEY'S OFFICE, GUN VIOLENCE TASK FORCE, 112 NORTH BROAD STREET, PHILADELPHIA, PA 19102, FURTHER DESCRIBED IN ATTACHMENT A | ) ) ) ) ) ) ) Case No. 26-mj-1330 |

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Pennsylvania_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____July 23, 2026_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the duty magistrate.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____

Digitally signed by Caroline Goldner Cinquanto
Date: 2026.07.09 17:06:07 -04'00'

*Judge's signature*

City and state: Philadelphia, PA

Honorable Caroline Goldner Cinquanto

*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  26-mj-1330 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE SEARCH OF
A BLACK APPLE IPHONE,
CURRENTLY LOCATED AT
PHILADELPHIA DISTRICT
ATTORNEY'S OFFICE, GUN
VIOLENCE TASK FORCE, 112 NORTH
BROAD STREET, PHILADELPHIA, PA
19102, FURTHER DESCRIBED IN
ATTACHMENT A

Case No. 26-mj-1330

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Franklin Fernandez, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been since March of 2018. Prior to ATF, I worked for approximately four years as a criminal investigator with the Naval Criminal Investigative Service ("NCIS") in Virginia Beach, VA, and was responsible for felony-level investigations that involved the United States Navy and Marine Corps, including investigations involving death, sexual assault, physical threats, and theft of United States government property. I am currently assigned to the Philadelphia Crime Gun Enforcement Team. Its primary mission is to investigate those individuals and groups that are engaged in the commission of violent state and federal violations. I am also deputized as a Philadelphia County Detective and empowered to investigate

violations of the Pennsylvania Crimes Code. While employed in these positions, I have received training in subject matters specific to each position's requirements in furtherance of law enforcement duties. In connection with my official duties, I investigate a variety of violations of federal criminal laws, including the investigation of violent crimes and other firearms-related offenses such as armed robberies, shootings, straw purchasing, and armed drug trafficking. Furthermore, during these and other investigations, I have seized cellular telephones, analyzed evidence from various social media platforms, and examined evidence from seized cellular telephones. I have executed pen registers/trap and trace warrants and property-related search warrants. I have also consulted with other agents and law enforcement officers during various types of investigations and the execution of search warrants.

3.      I have personally participated in the investigation set forth below. The facts in this affidavit come from my personal participation in the investigation, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. The dates and times listed in this affidavit should be read as "on or about" dates and times.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a)(1) (distribution of controlled substances), Title 18, United States Code, Section 922(g)(1) (possession of a firearm by a felon), and Title 18, United States Code, Section 933(a)(1) (trafficking in firearms) (collectively "the Target Offenses") have been committed by Vaughn SEGERS. There is also probable cause to believe that the electronically stored information described in Attachment B will lead to the discovery of evidence of these criminal violations.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

5.      The device to be searched is a black Apple iPhone, in a clear case, with two rear-facing cameras and a cracked front screen, and assigned call number 267-957-6216 ("**TARGET PHONE**"). The **TARGET PHONE** was recovered by ATF from the person of SEGERS during his federal arrest on June 11, 2026.

6.      The **TARGET PHONE** is currently located in evidence storage for the Gun Violence Task Force at the Philadelphia District Attorney's Office, 112 North Broad Street, Philadelphia, Pennsylvania 19102. The **TARGET PHONE** was seized by ATF during the execution of a federal arrest warrant of SEGERS on June 11, 2026, and has since been continuously kept in law enforcement custody. Based on my training and experience, I know that the **TARGET PHONE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET PHONE** came into the possession of the ATF.

7.      The applied-for warrant would authorize the forensic examination of the **TARGET PHONE**, which is further described in Attachment A, for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

8.      In October 2025, ATF investigators learned through a Confidential Source ("CS-1")[1] that SEGERS was distributing cocaine base, also known as "crack cocaine," in the West Philadelphia area. CS-1 provided ATF investigators with the call number of the **TARGET**

---

[1] CS-1 is known to law enforcement and is currently registered as an informant with the ATF. CS-1 has been cooperating for approximately eight (8) months in exchange for monetary compensation. CS-1 has been proven to be reliable in the past, and information provided to investigators has been corroborated by law enforcement.

3

**PHONE** as the contact number for a man named "Vito." CS-1 was familiar with "Vito" as he was a personal drug supplier for a family member of CS-1. Through law enforcement databases, Philadelphia court records, and T-Mobile, ATF determined that SEGERS is the subscriber and user associated with the call number assigned to the **TARGET PHONE**, 267-957-6216. More specifically, on January 26, 2026, pursuant to a grand jury subpoena, T-Mobile provided records that listed SEGERS as the current subscriber of the call number assigned to the **TARGET PHONE**, effective as of August 14, 2020.

9.      Between October 2025 and January 2026, ATF investigators made three controlled purchases of crack cocaine, a firearm, and cocaine from SEGERS through CS-1. The investigators attempted additional controlled purchases of firearms, crack cocaine, and fentanyl, but these attempts were unsuccessful due to the unavailability of CS-1 and/or SEGERS.

10.     During each of the above-mentioned controlled purchases and attempted controlled purchases, CS-1 was in contact with SEGERS on the **TARGET PHONE**. As recently as June 1, 2026, CS-1 again contacted SEGERS on the **TARGET PHONE**—in summary, CS-1 asked SEGERS if he had firearms for sale, SEGERS stated he did not, but indicated he had narcotics for sale.

<u>**CONTROLLED PURCHASE OF NARCOTICS: 10/28/2025**</u>

11.     On October 28, 2025, ATF conducted a controlled purchase of crack cocaine from SEGERS, using CS-1 as the purchaser. On October 27, 2025, at the direction of ATF, CS-1 contacted SEGERS on the **TARGET PHONE** to discuss the potential purchase of one ounce of crack cocaine. After an initial text conversation with SEGERS, CS-1 used a recorded line to call SEGERS on the **TARGET PHONE** to arrange to purchase one ounce of crack cocaine for $600 the following day, October 28. CS-1 specifically requested to purchase "rock," and SEGERS

4

responded that he would bring "top notch shit."

12.     On October 28, 2025, at the direction of ATF, CS-1 arranged with SEGERS via text to meet in the parking lot of the Courtyard by Marriott located at 4100 Presidential Boulevard, Philadelphia, Pennsylvania 19131. Before CS-1 went to this agreed-upon location, ATF Special Agent ("SA") Zachary Jordan and I checked CS-1 and his vehicle for money and contraband with negative results, provided CS-1 with prerecorded government funds to make the purchase, and equipped CS-1's vehicle with audio and video surveillance. CS-1 drove to the buy location with an activated audio and video surveillance device. SA Jordan and I maintained constant mobile surveillance of CS-1 as he traveled to the parking lot of the Courtyard by Marriott at 4100 Presidential Boulevard. Additional ATF investigators established physical surveillance in that parking lot.

13.     At approximately 2:27 p.m., SEGERS texted CS-1 from the **TARGET PHONE**, "I know here I come I'm trying to let this shit dry for you." Then, at approximately 2:50 p.m., he texted CS-1 that he was driving "[a] white Lincoln." At approximately 3:09 p.m., SEGERS entered the parking lot in a white Lincoln sedan bearing Pennsylvania license plate MPT7355 driven by an unknown black male with dreadlocks in a ponytail. SEGERS's Lincoln parked next to CS-1's vehicle, and SEGERS exited the Lincoln and entered the front passenger's seat of CS-1's vehicle. Once inside CS-1's vehicle, SEGERS provided CS-1 with a clear plastic sandwich bag containing two clear plastic sandwich bags of alleged crack cocaine in exchange for $800 from CS-1. During this exchange, CS-1 inquired about the possibility of purchasing firearms from SEGERS, and SEGERS advised that he could get "G2s"[2] for purchase. At approximately

---

[2] Investigators immediately recognized "G2s" as a reference to a Taurus G2 (or G2C), which is a 9mm semi-automatic pistol manufactured by Taurus Holdings, Inc.

3:13 p.m., SEGERS exited CS-1's vehicle, entered the Lincoln, and left the area.

14.     The suspected crack cocaine sold to CS-1 was submitted to the Philadelphia Police Department Office of Forensic Science Chemistry Unit Laboratory for further testing, and it tested positive for 33.513 grams of crack cocaine.

### CONTROLLED PURCHASE OF A FIREARM: 10/30/2025

15.     On October 30, 2025, ATF conducted a controlled purchase of a firearm from SEGERS, using CS-1 as the purchaser. On October 29, 2025, at the direction of ATF, CS-1 contacted SEGERS via FaceTime video call to the **TARGET PHONE** to discuss the potential purchase of a firearm. During the call, SEGERS displayed a handgun he had for sale. Later that night, CS-1 and SEGERS corresponded via text about completing the purchase of this firearm the following day, October 30. They agreed to meet the following afternoon to complete the purchase at the Fox Street Shopping Center, 3400 Fox Street, Philadelphia, Pennsylvania 19129.

16.     On October 30, 2025, before CS-1 went to this agreed-upon location to conduct the buy, SA Jordan and I searched CS-1 for money and contraband with negative results and provided CS-1 with prerecorded government funds to complete the purchase. ATF used an undercover ATF task force officer ("UC") to accompany CS-1 for the buy. CS-1 and the UC drove to the buy location in an undercover ATF vehicle equipped with activated audio and video surveillance. SA Jordan and I maintained constant mobile surveillance of the vehicle as it traveled to the parking lot of the Fox Street Shopping Center. Additional ATF investigators established physical surveillance in that parking lot. At approximately 3:08 p.m., at the direction of ATF, CS-1 called SEGERS from a recorded line to the **TARGET PHONE**. SEGERS answered and said he was "two minutes away . . . about to pull in now." At approximately 3:15 p.m., SEGERS entered the parking lot in a white Lincoln sedan bearing Pennsylvania license

plate MPT7355 occupied by three people. SEGERS's Lincoln parked next to the UC's vehicle, and SEGERS exited the rear passenger side of the Lincoln and entered the rear passenger side of the UC's vehicle. Once inside the UC's vehicle, SEGERS handed a black Ruger, model LC9S, 9mm semiautomatic pistol, with an obliterated serial number, loaded with seven rounds of ammunition, to CS-1 in exchange for $550 from CS-1. SEGERS stated, "I'm going to try to get the other jawn, you hear me," which CS-1 and ATF investigators understood to mean an additional firearm. SEGERS then exited the UC's vehicle, returned to the Lincoln, and exited the area. The purchased firearm matches the photograph of the firearm that SEGERS showed to CS-1 via FaceTime on the **TARGET PHONE** on October 29.

17.  ATF test fired the firearm on November 3, 2025, and determined the firearm to be operable and function as designed. ATF also conducted an Interstate Nexus examination on the firearm on January 12, 2026, and determined that the firearm was manufactured outside of Pennsylvania and has thus traveled in interstate commerce.

**CONTROLLED PURCHASE OF NARCOTICS: 01/12/2026**

18.  On January 12, 2026, ATF conducted a controlled purchase of cocaine from SEGERS, using CS-1 as the purchaser. On January 12, 2026, at the direction of ATF, CS-1 contacted SEGERS from a recorded line to the **TARGET PHONE** via text to discuss the potential purchase of two ounces of crack cocaine. CS-1 arranged to purchase two ounces of crack cocaine for $1200 later that day. At the direction of ATF, CS-1 arranged via text to meet SEGERS on the afternoon of January 12 at the Fox Street Shopping Center, 3400 Fox Street, Philadelphia, Pennsylvania 19129, the same location where they had met to complete the firearm purchase on October 30, 2025. During a call with CS-1 that afternoon, SEGERS indicated that he did not have time to cook the crack cocaine, so he would be selling CS-1 cocaine, to which CS-1

agreed.

19.     Before CS-1 went to the agreed-upon location for the buy, SA Jordan and I checked CS-1 and his vehicle for money and contraband with negative results, provided CS-1 with prerecorded government funds to make the purchase, and equipped CS-1's vehicle with audio and video surveillance. CS-1 drove to the buy location with an activated audio and video surveillance device. SA Jordan and I maintained constant mobile surveillance of CS-1 as he traveled to the parking lot of the Fox Street Shopping Center. Additional ATF investigators established physical surveillance in that parking lot. At approximately 4:10 p.m., SEGERS texted CS-1 from the **TARGET PHONE**, "I'm waiting on my BM gang. I'm only three blocks away from you though." After CS-1 responded and indicated that he could not wait and requested to go to SEGERS's location, SEGERS replied at approximately 4:18 p.m., "Pull up to 17 Erie."

20.     ATF investigators established surveillance in the area of North 17th Street and Erie Avenue in Philadelphia. At approximately 4:24 p.m., at the direction of ATF, CS-1 traveled to then parked at that intersection, while ATF investigators maintained constant surveillance on him. At approximately 4:36 p.m., investigators observed SEGERS drive onto the 3600 block of North 17th Street in a white Ford sedan bearing Pennsylvania license plate MLG9647. He was the sole occupant of that vehicle. SEGERS parked and exited the vehicle on that block, then entered the residence at 3640 North 17th Street. At approximately 4:45 p.m., SEGERS exited that residence, walked directly to CS-1's vehicle, and entered the front passenger's seat of CS-1's vehicle. Once inside CS-1's vehicle, SEGERS placed a clear plastic sandwich bag of alleged cocaine in the glove compartment in exchange for $1200 from CS-1. During this exchange, SEGERS explained to CS-1 how to "chef" or cook the cocaine into crack cocaine. At approximately 4:48 p.m., SEGERS exited CS-1's vehicle. CS-1 then drove away from the area to

8

meet SA Jordan and me at a predetermined location.

21.     The suspected cocaine sold to CS-1 was submitted to the Philadelphia Police Department Office of Forensic Science Chemistry Unit Laboratory for further testing, and it tested positive for 54.252 grams of cocaine.

### ARREST OF VAUGHN SEGERS

22.     On May 28, 2026, a sitting grand jury in the Eastern District of Pennsylvania returned a four-count true bill indictment charging SEGERS with distribution of 28 grams or more of cocaine base, being a felon in possession of a firearm, trafficking in firearms, and distribution of cocaine. An arrest warrant in Case Number 26-244 was issued for SEGERS's arrest on those charges that same day.

23.     On June 11, 2026, ATF investigators arrested SEGERS on the 1800 block of North Gratz Street, Philadelphia, Pennsylvania 19121, on the strength of the aforementioned warrant. I recovered the **TARGET PHONE** from SEGERS's person during a search incident to arrest. I used a government cell phone to call the suspected number of 267-957-6216 assigned to SEGERS's device. I confirmed this to be the number of the **TARGET PHONE**. I entered the **TARGET PHONE** into ATF custody. SEGERS was then transported to the Federal Detention Center in Philadelphia, Pennsylvania.

24.     As explained herein, information electronically stored within a smartphone or camera may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element, or alternatively, to exclude the innocent from further suspicion. In my training and experience, I know the information stored within a smartphone like the **TARGET PHONE** can indicate who has used or controlled the device at or near the crime(s) in question. This "user

9

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, text messages, contact lists, and images sent (and the metadata associated with the foregoing, such as date and time) may indicate who used or controlled the device at a relevant time.

25.     Based on my training and experience, I know it is common for individuals involved in criminal activity to "brag" in various ways about the crimes they have committed and the crimes they have knowledge about, to both their associates and, at times, to their intended victims. I have been involved in several criminal investigations where those responsible for a crime and/or who have knowledge of a specific crime have taken photographs/videos of evidentiary value and have stored them in their cellular phone or have communicated and shared such items through SMS/MMS or iMessages with other individuals. These items of evidentiary value can assist in revealing associates and/or co-conspirators and/or participants.

26.     Based on my training, experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, I also know:

        a.     Drug and firearm traffickers commonly use cellular telephones to communicate with other firearm and drug traffickers and customers about related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other Internet- and application-based communication forums. Moreover, these traffickers commonly use other capabilities of cellular telephones to further their trafficking activities, including to take photos and videos of items for sale, to browse the Internet, to update their social media sites, and to obtain maps and

directions. Indeed, during each of the controlled purchases in this case, SEGERS used the **TARGET PHONE** to further his illicit activities.

b. Drug and firearm traffickers often have access to large amounts of United States currency in order to maintain and finance their ongoing trafficking activities. These traffickers commonly use cellular telephones to facilitate the payment for goods, or to send cash to co-conspirators, using mobile payment applications such as CashApp and Venmo.

c. Drug and firearm traffickers and persons involved in the manufacturing, distributing, sorting, and possession of controlled substances often possess firearms and other weapons, both legal and illegal, in order to protect their person, drugs, or the proceeds of drug transactions. Moreover, these traffickers commonly use cellular telephones to take photographs of their firearms they possess, acquire, and sell.

27. Based on my training and experience, the evidence obtained throughout this investigation, and the circumstances of the recovery of the **TARGET PHONE**, I believe there is probable cause that the **TARGET PHONE** contains all or some of the evidence described in paragraphs 24-26.

28. The **TARGET PHONE** is currently in the lawful possession of law enforcement. It came into ATF's possession in the following way: on June 11, 2026, ATF investigators arrested SEGERS on the 1800 block of North Gratz Street, Philadelphia, Pennsylvania 19121 pursuant to the arrest warrant issued in Case Number 26-244. I recovered the **TARGET PHONE** from SEGERS's person during a search incident to arrest. I used a government cell phone to call the suspected number of 267-957-6216 assigned to SEGERS's device. I confirmed

11

this to be the number of the **TARGET PHONE**. The **TARGET PHONE** was retained as evidence as ATF Property Item #4.

29.    The **TARGET PHONE** is currently located in evidence storage for the Gun Violence Task Force at the Philadelphia District Attorney's Office, 112 North Broad Street, Philadelphia, Pennsylvania 19102. Based on my training and experience, I know that the **TARGET PHONE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET PHONE** came into the possession of the ATF.

## **TECHNICAL TERMS**

30.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    <u>Wireless telephone</u>: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files;

12

storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

13

d.    GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.    PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them

14

many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f.    <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

31.    Based on my training, experience, and research, I know that the **TARGET PHONE** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and to provide access to the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

<u>**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**</u>

32.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

33.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET PHONE** was used, the purpose of its use, who used it, and when. There is

15

probable cause to believe that this forensic electronic evidence might be on the **TARGET PHONE** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its

16

use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

34.    *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARGET PHONE** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **TARGET PHONE** to human inspection in order to determine whether it is evidence described by the warrant.

35.    *Manner of execution*. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve further physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

36.      I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET PHONE** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*/s/ Franklin Fernandez*
Franklin Fernandez
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to by telephone
on July _____, 2026.

Digitally signed by Caroline
Goldner Cinquanto
Date: 2026.07.09 17:08:31 -04'00'

HONORABLE CAROLINE GOLDNER CINQUANTO
UNITED STATES MAGISTRATE JUDGE

18

**ATTACHMENT A**

The property to be searched is a black Apple iPhone, in a clear case, with two rear-facing cameras and a cracked front screen, and assigned call number 267-957-6216 ("**TARGET PHONE**"). The **TARGET PHONE** is currently located in evidence storage for the Gun Violence Task Force at the Philadelphia District Attorney's Office, 112 North Broad Street, Philadelphia, Pennsylvania 19102. The **TARGET PHONE** was seized by ATF during the execution of a federal arrest warrant of Vaughn SEGERS on June 11, 2026, and has since been continuously kept in law enforcement custody.

This warrant authorizes the forensic examination of the **TARGET PHONE** for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.       All records on the **TARGET PHONE** described in Attachment A that relate to violations of Title 21, United States Code, Section 841(a)(1) (distribution of controlled substances), Title 18, United States Code, Section 922(g)(1) (possession of a firearm by a felon), and Title 18, United States Code, Section 933(a)(1) (trafficking in firearms) from on or about October 1, 2025, through on or about June 11, 2026, including:

     a.       lists of customers and related identifying information;

     b.       communications, images, and any other information relating to the types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

     c.       communications, images, and any other information relating to the theft, acquisition, possession, trafficking, smuggling, and/or export of firearms;

     d.       any information related to sources of drugs and/or firearms (including names, addresses, phone numbers, or any other identifying information);

     e.       all bank records, checks, credit card bills, account information, and other financial records;

     f.       information relating to members of a drug and/or firearm distribution network;

     g.       information relating to members of a drug and/or firearm supply network;

     h.       location information reflecting the travel or movement of controlled substances and/or firearms, the location of drug and/or firearm trafficking locations, and the identification of other drug and/or firearm traffickers, customers and sources of supply.

2.      Any records and information found within the digital contents of the **TARGET PHONE** showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, correspondence, photographs, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.